UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES ABATE, ANDREW BANG AND D. WAYNE ROBINSON<br><br>Plaintiffs,<br><br>-against-<br><br>FIFTH THIRD BANK<br><br>Defendant. | ECF Case (VM)<br><br>13 CV 9078<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

*JUDGE MARRERO*

*RECEIVED DEC 23 2013 U.S.D.C. S.D. N.Y. CASHIERS*

Plaintiffs James Abate, Andrew Bang and D. Wayne Robinson, by and through their

undersigned attorneys Hoguet Newman Regal & Kenney, LLP, allege as follows:

## NATURE OF THE CLAIM

1.     This is an action for damages arising from Fifth Third Bank's breach of its

commitment to provide a fully collateralized business line of credit, resulting in the forced

dissolution of the plaintiffs' investment management company, Drexel Hamilton Investment

Partners, LLC ("DHIP"), a Service Disabled Veteran Owned Small Business registered with the

Department of Veterans Affairs and Securities and Exchange Commission.  Over the course of

five months, Fifth Third engaged in a course of deception and delay, repeatedly assuring

plaintiffs that all material terms of the loan agreement were agreed to and the transaction would

be closing imminently.

2.     Indeed, Fifth Third cited its "special commitment" to veteran-owned businesses in

convincing DHIP to terminate its discussions with another bank regarding a comparable loan.

Fifth Third prides itself on showing its appreciation and gratitude for veterans and soldiers

through fundraising efforts and events, special banking privileges to current and former U.S.

Military, and, in the case of businesses like DHIP, mentoring or protégé relationships with veteran-owned business. Relying on Fifth Third's representations, the plaintiffs -- three former owners of DHIP – pledged their membership interests in DHIP in order to obtain forbearance on an existing loan that was past due, which Fifth Third's loan would be used in part to repay, as well as provide vital working capital and growth capital to fuel DHIP's growing business.

3.      In the end, after agreeing on all essential terms of the loan agreement, and stringing plaintiffs along for months, Fifth Third suddenly went silent on the evening of the long-awaited closing. After sending plaintiffs an email stating that "legal is complete, closing is imminent" and "this is done," Fifth Third reneged on its agreement – by text message – and the loan was never issued. Fifth Third's deliberate acts led to the dissolution of plaintiffs' Service Disabled Veteran Owned Business, and cost the plaintiffs their ownership interests in DHIP, and, in the case of Mr. Bang and Mr. Robinson, their jobs and livelihood in the investment management field.

## PARTIES

4.      Plaintiff D. Wayne Robinson is an individual residing in Virginia. Mr. Robinson was formerly a member/partner of DHIP.

5.      Plaintiff Andrew Bang is an individual residing in New York. Mr. Bang was formerly a member/partner and Managing Director of DHIP.

6.      Plaintiff James Abate is an individual residing in New Jersey. Mr. Abate was formerly a member/partner of DHIP.

7.      Upon information and belief, Defendant Fifth Third Bank ("Fifth Third") is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

2

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as this is a civil action between diverse parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      Defendant Fifth Third is registered to conduct business in New York.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2).

## BACKGROUND

### Plaintiffs' Service Disabled Veteran Owned Small Business

11.     Messrs. Robinson, Bang and Abate (the "Plaintiffs") are all military veterans.

12.     Mr. Robinson is a service-disabled military veteran and retired Command Sergeant Major, U.S. Army.  He received over 39 awards and commendations during his time in the Army.

13.     Mr. Abate is a former commissioned officer, U.S. Army. He is an experienced fund manager, having been employed at Centre Asset Management, GAM, Credit Suisse and PricewaterhouseCoopers as a Managing Director, Fund Manager, or Manager.

14.     Mr. Bang is a former commissioned officer, U.S. Army who has wide experience in asset management at UBS and GE, and who formerly served as a Vice President at AIG Global Investments and a Senior Vice President at Shinan Investments America.

15.     In November 2010, DHIP, an Investment Manager with expertise in asset allocation and manager selection, was formed by Mr. Bang and Mr. Abate along with other members, including those who worked for Drexel Hamilton, LLC, an institutional broker-dealer, all of whom were veterans and some of which were service-disabled military veterans.  In

December 2011, Mr. Robinson came on as head of Institutional Business Development and member/partner.

16.     In January 2012, members that remained associated with Drexel Hamilton, LLC divested their ownership in DHIP due to regulatory conflict with being dually associated with a registered investment adviser and broker-dealer.

17.     In February 2012, another DHIP member who is a retired former commissioned officer and highly decorated (Congressional Medal of Honor recipient) service-disabled military veteran, U.S. Army, who had wide experience in asset management with Bankers Trust and Lehman Brothers joined as a partner and Chairman.  At this time, DHIP and this member established a "Heroes and Service Trust," enabling it to better offer meaningful employment and ownership opportunities to disabled veterans desiring a career in investment management with DHIP.

18.     To its knowledge, DHIP was the first Department of Veteran Affairs registered Service Disabled Veteran Owned Small Business to be registered with the Securities and Exchange Commission as an investment adviser and the first to offer its services as the investment adviser to a registered and regulated series of mutual funds.

19.     As of December 21, 2011, DHIP had launched and was managing a series of public, regulated mutual funds (the "Funds").

20.     As a first mover in this area of Disabled Veteran Owned investment management, DHIP was poised for explosive growth: within a mere 18 months of launching its Funds, DHIP had $200 million in assets under management from institutions and other investors.

21.     DHIP's rate of growth was no less impressive.   At the time, its principals projected that its assets under management would rise exponentially to well in excess of $1 billion within three to five years.

22.     Industry valuation metrics indicated a fair market value of this enterprise – at the time Fifth Third destroyed it – of between $10 and $15 million.

### Fifth Third Pursues a Relationship with DHIP

23.     In or about September 2012 plaintiff Mr. Robinson, and Edward Schrank, a Vice President at Fifth Third with responsibility for disabled veteran outreach, held an initial meeting regarding DHIP, having met through veteran-related events.

24.     Like Mr. Robinson, Mr. Schrank is a decorated service-disabled military veteran.

25.     Mr. Schrank wanted to discuss a relationship between Fifth Third and DHIP because the bank was planning to launch a group dedicated to veteran owned businesses.

26.     Mr. Schrank began actively pursuing and soliciting the members of DHIP to form an alliance with Fifth Third.

27.     On or about October 25, 2012, plaintiffs Abate, Bang and Robinson ("Plaintiffs") attended an introductory meeting in Chicago with Mr. Schrank, to discuss DHIP's background, capabilities, and products.

28.     During this meeting, Mr. Schrank again expressed Fifth Third's interest in developing a long-term relationship with DHIP.

29.     Through the remainder of 2012 and early 2013, Mr. Schrank gathered information about, and did due diligence on, DHIP, speaking to Mr. Robinson from time to time.

30.     Fifth Third and Mr. Schrank continued to court DHIP, inviting plaintiff Mr. Robinson to a "DHIP mentoring discussion" over lunch on February 11, 2013.   Specifically,

Fifth Third told Plaintiffs that it wanted to showcase DHIP as a "marquee client" for their forthcoming veteran's initiative. Fifth Third proposed that eventually DHIP would utilize Fifth Third for custody services, meaning that Fifth Third would become the custodian of DHIP's mutual funds and considerable assets under management, and that Fifth Third would help DHIP raise funds and grow their business further. Mr. Schrank said that getting a loan from Fifth Third would be a formality, or the "first step" that would get DHIP "in the door" to establish this "Mentor-Protégé" relationship.

31.     Mr. Robinson was subsequently invited by Mr. Shrank to attend a February 25, 2013 event at the Pritzker Military Library in Chicago, at which Fifth Third announced its Military Business Resource Group ("Military BRG"), an initiative and commitment to veteran owned businesses to be headed by Mr. Schrank. At this meeting, Mr. Robinson was introduced to many members of Fifth Third's senior leadership.

32.     Upon information and belief, Fifth Third's Military BRG was part of Fifth Third's outreach to current and former U.S. Military. Fifth Third offers various special banking privileges, and heads community outreach initiatives aimed at showing its appreciation and gratitude for veterans and soldiers.

33.     Fifth Third and its Military BRG continued to pursue DHIP. On or about March 7, 2013, Mr. Robinson met in Chicago with Joseph Carter, a former Army Captain and senior vice president and co-chair of the Veteran BRG at Fifth Third. Mr. Carter, at and subsequent to that meeting, reiterated Fifth Third's interest in working with DHIP.

### Fifth Third Accepts DHIP's Loan Request, and Strings Them Along for Months

34.     Following these Chicago meetings, in or about March 2013, Mr. Robinson and Mr. Schrank began discussing DHIP's opening a business revolving line of credit ("RLOC"). Mr. Schrank stated that the process would take only a couple of weeks to complete.

35.     The RLOC under discussion was a standard Fifth Third product sold to its business customers.  The RLOC had standard terms and conditions for all customers.

36.     DHIP was in need of a business loan to repay an existing loan that was due and payable on May 31, 2013, for operating capital for daily business operations, and for growth capital for its continuing expansion.  For instance, DHIP planned to hire another disabled veteran for Fund sales and business development, and was preparing for a launch of a new fund series and share classes to complement the existing series of Funds.

37.     On or about March 15, 2013, Plaintiffs as members of DHIP held a conference call with Fifth Third's Private Bank during which Plaintiffs gave a presentation regarding DHIP's capabilities and financials, the parameters of the "Mentor-Protégé" relationship between Fifth Third and DHIP, and the exact uses for the RLOC that DHIP requested.

38.     As of this date, March 15, Fifth Third knew that DHIP needed the loan for repayment of an existing line of credit, as well as for working capital and operating expenses, including the hiring of additional service disabled veterans to bolster its fund management, distribution and operating resources.

39.     As of about March 28, 2013, weeks after Fifth Third and Plaintiffs began to discuss the RLOC, Mr. Schrank expressed to plaintiff Mr. Robinson that he had about 80% informal approval from Fifth Third's office of financial institutions for an unsecured RLOC to DHIP.

40.     In or about early April, Mr. Carter advised Mr. Robinson that Fifth Third may be able to approve a loan of up to $1.3 million with a personal guarantee of $550,000.

41.     On or about April 25, 2013, after extensive discussion between Plaintiffs, Mr. Schrank, and Mr. Carter about the terms of the loan and DHIP's business, Mr. Schrank submitted DHIP's formal loan request to a team led by Patrick O'Connell, another vice president at Fifth Third. Mr. Schrank stated that he expected approval and closure on the RLOC within one week.

42.     As early as May 9, 2013, but no later than June 26, 2013, the parties had agreed on all essential terms of the line of credit.

43.     On or about May 9, 2013, a conference call was held between Mr. Schrank and Mr. O'Connell for Fifth Third, and Plaintiffs for DHIP, regarding the terms of RLOC. The parties agreed to Fifth Third's standard RLOC in the amount of $900,000, with payments of interest only, a one-year term subject to renewal, at an interest rate equal to the prime rate minus 50 basis points. All parties understood that the loan was subject to Fifth Third's standard documentation.

44.     Due to the imminent RLOC anticipated from Fifth Third's representatives, DHIP induced its lender to agree to a period of forbearance on the loan and modified its maturity date to June 30, 2013. Also due to the supposedly imminent RLOC, DHIP represented to the Board of Trustees for the Funds, on or about May 23, 2013, that DHIP would be able to execute its growth plan.

45.     Although all material terms had been agreed upon in early May, and although Fifth Third told Plaintiffs that the loan would take only a few weeks to complete, by June 2013, little progress had been made towards closing on the loan. Plaintiffs pressed Mr. Schrank as to

the status of the RLOC at least on a weekly basis, as the money was needed by the end of June to

repay the aforementioned prior loan as well as for operating and growth working capital.

46.     On June 5, plaintiff Mr. Robinson conveyed to Mr. Schrank the direness of

DHIP's financial situation because of Fifth Third's delay in an email stating, in part:

> Good Afternoon. In reaching out to 5/3rd back in March to apply for a loan under the
> Business Resource Group's outreach to veteran owned business, my partners and I
> weren't aware that this would take 3 months. . . . We are fast approaching an almost 12
> week period of processing. *During this time period our resource status has changed from
> light green to bright yellow*." [Emphasis added].

47.     Mr. Schrank continued to assure Plaintiffs that everything was on track in order to

dissuade Plaintiffs from seeking financing elsewhere.

48.     On or about June 6, 2013, Mr. Schrank conveyed to Mr. Robinson for the first

time that the loan would need to be fully collateralized.  Plaintiffs were surprised by this news,

but still intent on securing the loan.  Plaintiffs were told that with this requested collateral, the

loan request would be a "slam dunk."

49.     Plaintiffs continued to press Fifth Third at least weekly about the status of the

loan.

50.     On June 26, 2013, the parties' agreement regarding the terms of the RLOC was

confirmed on a second conference call between Ed Schrank, Patrick O'Connell, Steven Terborg

for Fifth Third and Plaintiffs for DHIP.

51.     Mr. O'Connell confirmed the parties' agreement, but stated that the while the

interest rate would be roughly equivalent to prime minus 50 basis points, it would be expressed

in terms of the equivalent LIBOR-based rate.  Mr. O'Connell stated that this cosmetic change

was necessary because the RLOC product had standard terms.

9

52.     On or about July 9, 2013, Fifth Third confirmed the RLOC would be issued to DHIP subject to a cash guarantee as collateral and stated that it expected approval and funding within 48 hours.

53.     On or about July 12, 2013, Plaintiffs and DHIP on one hand, and Sanlam International Investments USA Holdings, Inc. ("Sanlam"), the entity that owned a majority interest and controlled the creditor to DHIP on the other, entered into an agreement under which the members of DHIP, including Plaintiffs, granted Sanlam the option to purchase their membership interests in DHIP for a nominal payment (the "Sanlam Agreement") in the event of a default event   Sanlam agreed to provide $600,000 of cash collateral to support the loan Plaintiffs understood Fifth Third would provide. This agreement was entered into entirely in reliance on Fifth Third's promise and assurance to Plaintiffs that it would promptly approve and issue the RLOC.

54.     By mid-July 2013, progress still lagged, despite Plaintiffs' numerous inquiries about the status of the RLOC.  These inquiries were all met with assurances from Fifth Third.

55.     During this period, Mr. Schrank and Fifth Third Business Banking leader and senior vice president Timothy Doyle, Mr. Schrank's supervisor, repeatedly represented to Plaintiffs that the RLOC would be approved.

56.     Then, on or about July 17, 2013, Mr. O'Connell promised Mr. Abate by email that he would send a commitment for him to review "shortly," and assured him that there was no approval risk because "we are not underwriting based on performance on these [requested financial documents] since we have the collateral we have . . . ."

57.     Also on July 17, in response to Mr. O'Connell's July 17 email, plaintiff Mr. Abate reminded him of DHIP's need for immediate funding.

58.     Yet, further delay ensued.  Again, on July 23, Plaintiffs reiterated the need for DHIP to be funded by July 25, the end of the week, and Mr. O'Connell advised that the DHIP loan process was "bumped to the front of the line" and that "[t]his should be wrapped up this week."  Once again, Fifth Third promised the loan would be approved and disbursed within 48 hours.

59.     As of July 25, 2013, Fifth Third had still not provided instructions to activate the accounts to deposit the loan collateral, despite numerous requests by Plaintiffs to open and fund the accounts.

60.     Fed up with the unexplained delays, Mr. Abate told Mr. Schrank that he was discussing alternate financing with J.P. Morgan, a bank with whom Mr. Abate had a business relationship.  The financial condition and doubt about its ability to execute its plans for intended growth and distribution initiatives of DHIP was becoming an issue of concern to the mutual fund Board of Trustees.  The need for DHIP to obtain financing was paramount.

61.     On July 25, following a conversation with J.P. Morgan regarding obtaining a loan there, Mr. Abate received an email from J.P. Morgan providing the account-opening documentation for a savings account that would hold a portion of the collateral for a loan issued by J.P. Morgan, and account opening documents for a DHIP business checking account with J.P. Morgan.

62.     Mr. Schrank called Mr. Abate that same day, July 25. During this and another call that day, Mr. Schrank told Mr. Abate not to pursue funding with J.P. Morgan, claiming that Fifth Third's dedication to veterans and military families presented DHIP with greater opportunity than any other lender would, and that Fifth Third would showcase DHIP as the principal military

veteran owned business partner under Fifth Third's "Diversity Blueprint" and community support programs.

63.    Mr. Schrank also reassured Mr. Abate that Fifth Third, along with Messrs. O'Connell and Doyle were "committed to DHIP" and that once DHIP became a loan customer of Fifth Third, avenues for cooperation and assistance between DHIP and Fifth Third existed at the highest executive level.  He stated that DHIP would receive attention and priority to include investment into the funds advised by DHIP as well as distribution support.  Mr. Schrank advised that Fifth Third needed just one more day to complete their internal processes.

64.    In reliance on this, Mr. Abate responded to the email from his contact at J.P. Morgan on July 26 stating: "After further discussion, DHIP is most likely to obtain the financing from Fifth Third Bank, who is trying to become the 'military veterans bank.'" Mr. Abate added that ceasing discussions with J.P. Morgan would not impact his other business dealings with that bank.

65.    On July 26, 2013, in reliance on Fifth Third's assurances that the closing was imminent, the required Loan Cash Guarantee of $600,000 was deposited in a Fifth Third established bank account to serve as collateral for the RLOC.  This collateral was secured at great personal cost to Plaintiffs, as they had pledged the entirety of their stock and ownership interests in DHIP in reliance on the assurance that Fifth Third Bank would not have to underwrite for performance, and other representations of Mr. Schrank that Fifth Third Bank would provide the RLOC.

66.    Mr. O'Connell told Mr. Bang by email that he was pushing "to have closing docs today [July 26]," which again did not happen.  Mr. O'Connell then said "[w]e are on track to have closing documents on Monday [July 29].

67.     On Monday July 29, a $300,000 personal check from Plaintiff Mr. Abate (which had been mailed on Friday, July 26) was deposited in a Fifth Third established bank account. This was an additional personal loan cash guarantee to be used as collateral for the loan at great personal cost to Mr. Abate.

68.     Thus, the $900,000 loan was fully collateralized, satisfying any condition precedent to the finalization of the loan by Fifth Third.

69.     However, Mr. O'Connell continued to stall, assuring Mr. Bang by email on the afternoon of July 29 that he had been "hounding our document folks all day, will know shortly [if Bang could expect closing documents that day]."

70.     Over the next two weeks, Plaintiffs continued to inform Fifth Third that they could not wait any longer for the funding.  For example, on August 1, Mr. Bang wrote to Mr. Schrank, "Paperwork done tomorrow and $$ wired on Monday??? (please)  Obviously, we need it ASAP…"

71.     Mr. Schrank and Mr. O'Connell continued to string Plaintiffs along with double talk and requests for documents that Fifth Third Bank already had or hardly needed, given that the bank was "not underwriting for performance."

72.     On August 5, 2013 plaintiff Mr. Bang again wrote to Mr. Schrank that "the continual and unending delay is totally unsatisfactory and has had a severe and costly impact on our business." The loss of DHIP's credibility with the Fund's Board of Trustees and service providers to the Funds was escalating.

73.     On the morning of August 8, Mr. O'Connell emailed Mr. Abate and Mr. Bang asking if they wanted to fund at closing or draw at a later date, and with closing instructions.  He stated: "I will email you the doc for signature. You can sign and email back.  We can close and

fund with electronic copies. Please send originals to my address below. I anticipate having documents to send you by this afternoon."

74.   Mr. Bang promptly responsed by email, instructing Fifth Third to fund immediately at closing, and promising review, sign and return the documents quickly. In reply, Mr. O'Connell wrote, at 10:49 am: "[s]tay tuned, we should have docs shortly." The afternoon of August 8 he wrote to Mr. Bang: "We are close [with the documents]. All hands are on deck to get them out the door." The documents were not sent on August 8, nor on Friday August 9.

75.   Finally, on Monday August 12, 2013, with the collateral in place since July 29, and after weeks of false starts and broken promises, Mr. Schrank wrote to them, "legal is complete, closing is imminent based on credit telling doc team to release. Credit was waiting on legal so *this is done*." (Emphasis added).

76.   But the RLOC was not "done" on August 12, nor ever.

77.   In the days after Mr. Schrank wrote that the RLOC was "done," Fifth Third Bank abruptly stopped communicating with DHIP and Plaintiffs.

78.   On August 15, 2013, DHIP's creditor issued a loan demand for payment, stating that it would exercise its full right to collect owed monies if the loan remained unpaid by August 19, 2013.

79.   On August 16, Mr. Schrank informed Mr. Robinson by text message that Fifth Third would not provide the promised RLOC to DHIP.

80.   Thus, the fully collateralized RLOC that was "done" earlier in the week was now somehow undone, and retroactively disapproved.

81.   By this time, it was too late for Fifth Third and plaintiffs to reach out to another bank to obtain funding by the August 19, 2013 collection deadline on the prior loan.

## Consequences of Fifth Third's Conduct

82.     Upon learning of Fifth Third's broken promise, Plaintiff Abate and loan guarantor (Sanlam) immediately withdrew their cash collateral deposited at Fifth Third back.

83.     However, the damage to Plaintiffs and DHIP was irreparable.

84.     The loss of the expected $900,000 RLOC left DHIP short of working capital, unable to retire its past-due older debt, and unable to meet commitments for growth in the Funds (e.g., employment of other disabled veterans, preparation for launch of a new fund series and share classes to complement the existing Funds, and other actions that were put in place based upon Fifth Third Bank's commitment to DHIP).

85.     Because it could no longer retire the older debt as it had promised to do, and could not meet ongoing and new growth capital commitments, DHIP became nearly insolvent and incapable of further growth.

86.     On September 13, DHIP was terminated as the investment adviser to the Funds it managed by the Fund's Board of Trustees, principally because of its inability to continue as a going concern and execute on its commitments for growth due to Fifth Third Bank's failure to honor its commitment to DHIP.

87.     The stripping of DHIP's mutual fund investment advisory contract resulted in the loss of all DHIP's assets under management, and effective September 14, 2013, Plaintiffs had no choice but to sell their membership interests for a nominal payment to the creditor of its existing debt, pursuant to the Sanlam Agreement.  As described above, the creditor had previously agreed to a period of forbearance with DHIP based on Fifth Third's representations that the RLOC was imminent.

88.     Plaintiffs received only nominal consideration for their membership interests in DHIP after its termination by the mutual fund Board of Trustees and loss of all of its assets under management.

89.     Not only did Plaintiffs lose control of DHIP, but DHIP therefore lost its position as the first Service Disabled Veteran Small Business investment management firm managing a series of registered mutual funds with assets over $200 million in management from institutions and other investors.

90.     Given the lead time necessary to become an SEC registered investment adviser, build the investment management infrastructure, launch products, raise assets, and establish a track record, it would be impossible to become a first mover in this area again.

91.     Furthermore, DHIP's charter was to work to benefit the community of service-disabled veterans by recruiting, hiring and training disabled military veterans, such as Mr. Robinson, whenever possible, for careers in investment management.

92.     Given DHIP's destruction, Fifth Third Bank has denied Plaintiffs and DHIP the opportunity to hire additional disabled-veterans attempting to transition to the investment management industry.

93.     DHIP has lost all of the funds it had under management and has been de-registered with the SEC.

94.     Thus, a rapidly growing business enterprise was put out of existence by Fifth Third's conduct. Plaintiffs lost all of their shares in DHIP, which have an indicated present fair market value of approximately $10 - $15 million. Plaintiffs owned 59% of these interests.

95.     Furthermore, Plaintiffs Bang and Robinson, along with many others, have lost their jobs and livelihoods in the investment management field.  Plaintiffs lost compensation in the form of their partner distributions from DHIP

96.     Plaintiffs' reputations within the investment management business have been damaged by DHIP's termination as the investment adviser to the funds, and the subsequent dissolution of DHIP.

### FIRST CAUSE OF ACTION
**(Promissory Estoppel)**

97.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

98.     Defendant Fifth Third and/or its personnel made clear and unambiguous promises that: (a) "legal is complete, closing is imminent based on credit telling doc team to release," that (b) "[c]redit was waiting on legal so this is done," (c) they were interested in developing a long-term relationship with DHIP, (d) at an early stage, that Mr. Schrank had about 80% informal approval from Fifth Third's office of financial institutions for an unsecured RLOC, (e) Fifth Third was "committed" to DHIP, (f) there was no approval risk for the loan because Fifth Third was "not underwriting based on performance" since it had full collateral, (g) Mr. O'Connell would send the documents for Mr. Abate to review "shortly," (h) the loan "should be wrapped up this week," (i) to "[s]tay tuned, we should have the docs shortly," (j) "[w]e are close [with the documents]. All hands are on deck to get them out the door," (k) Mr. O'Connell would "email . . . the doc for signature," and that "we can close and fund with electronic copies," and, (l) in convincing DHIP not to pursue a loan with another bank, that Fifth Third would showcase DHIP as the principal military veteran-owned business partner under Fifth Third's "Diversity Blueprint" and community support programs.

99.     Plaintiffs reasonably and foreseeably relied on the aforesaid promises by Defendant Fifth Third by, among other things,  (a) terminating discussions with other companies to seek alternate financing and (b) pledging their ownership interests in DHIP in exchange for an extension on a pre-existing loan, which the proceeds from the Fifth Third loan were to be used to repay.

100.    As set forth above, Fifth Third breached its foregoing promises.

101.    As a consequence of relying on Fifth Third's promises, Plaintiffs suffered injuries including the loss of the value of their membership interests in DHIP, harm to their professional reputations and loss of partner distributions.

102.    Plaintiffs were harmed in an amount to be determined at trial, but in no event less than $10 Million.

### SECOND CAUSE OF ACTION
#### (Fraud)

103.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

104.    As set forth above, from March to August 2013, defendant Fifth Third and/or its agents or personnel made material misrepresentations of existing fact to Plaintiffs, including but not limited to: (a) that "legal is complete, closing is imminent based on credit telling doc team to release," that (b) "[c]redit was waiting on legal so this is done, (c) they were interested in developing a long-term relationship with DHIP, (d) at an early stage, that Mr. Schrank had about 80% informal approval from Fifth Third's office of financial institutions for an unsecured RLOC, (e)  that Fifth Third was "committed" to DHIP, (f) that there was no approval risk for the loan because Fifth Third was "not underwriting based on performance" since they had full collateral, (g) that Mr. O'Connell would send the documents for Mr. Abate to review "shortly,"

(h) the loan "should be wrapped up this week," (i) to "[s]tay tuned, we should have the docs shortly," (j) that "[w]e are close [with the documents]. All hands are on deck to get them out the door," and (k) Mr. O'Connell would "email . . . the doc for signature," and that "we can close and fund with electronic copies," and, (l) in convincing DHIP not to pursue a loan with another bank, that Fifth Third would showcase DHIP as the principal military veteran-owned business partner under Fifth Third's "Diversity Blueprint" and community support programs.

105.   Upon information and belief, defendant Fifth Third and/or its agents or personnel made these misrepresentations knowingly or recklessly, with intent to induce reliance thereon by Plaintiffs.

106.   Plaintiffs justifiably and reasonably relied on Fifth Third's misrepresentations, including but not limited to by (a) continuing to proceed with negotiations with Fifth Third and terminating discussions to seek financing with other companies willing to offer a comparable loan, (b) Plaintiffs' pledging their membership interested in DHIP to an existing creditor, believing it had secured funding from Fifth Third to reimburse that creditor for its outstanding loan that had come due.

107.   Plaintiffs suffered actual, consequential, and special damages, including damages separate and apart from those recoverable as contract damages, as a result of their reliance on Defendant's misrepresentations, including the loss of the value of their membership interests in DHIP, harm to their professional reputations and loss of partner distributions.

108.   Plaintiffs were harmed in an amount to be determined at trial, plus punitive damages.

### THIRD CAUSE OF ACTION
**(Breach of Contract)**

109.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

110.   DHIP and Fifth Third entered into a valid and binding oral contract to enter into a loan agreement, defining the amount, term, interest rate, and provisions for repayment of the loan, and Fifth Third represented that the deal was "done."

111.   Plaintiffs, as the members and owners of DHIP, were known and intended as third-party beneficiaries to the contract.  DHIP intended that Plaintiffs, the owners of DHIP, would benefit from the contract, as their business would continue to grow and their livelihoods would be secure.

112.   At all times relevant to this Complaint, Plaintiffs and DHIP satisfactorily completed their obligations under the loan agreement by, among other things, providing all information requested by DHIP and depositing full collateral for the loan.

113.   At all times relevant to this Complaint, Plaintiffs and DHIP were ready, willing and able to continue performance under the agreement.

114.   Fifth Third willfully violated the loan agreement by failing to issue the RLOC to DHIP according to the parties' agreement.

115.   Fifth Third knew that DHIP needed a loan imminently and that its business and Plaintiffs would suffer damage if the obligation to lend money was breached.

116.   Fifth Third's failure to issue the RLOC to DHIP constituted a breach of the loan agreement.

117.   Plaintiffs, as members of DHIP, were harmed by Fifth Third's breach of the agreement as set forth above, and suffered actual, consequential and special damages including

the loss of the value of their membership interests in DHIP, harm to their professional reputations and loss of partner distributions

118.   Plaintiffs were harmed in an amount to be determined at trial, but in no event less than $10 million.

### FOURTH CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

119.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

120.   DHIP and Fifth Third entered into a valid and binding oral contract enter into a loan agreement for the RLOC.

121.   Plaintiffs, as the members and owners of DHIP, were known and intended as third-party beneficiaries to the contract.   DHIP intended that Plaintiffs, the owners of DHIP, would benefit from the contract, as their business would continue to grow and their livelihoods would be secure.

122.   Implied in all contracts, including the loan agreement, is a covenant of good faith and fair dealing which is breached when a party to the contract acts in a manner that, although not constituting a breach of the contract, deprived the other party to the contract of the right to receive the benefits of the agreement.

123.   At all times relevant to this Complaint, Plaintiffs and DHIP performed satisfactorily its obligations under the loan agreement.

124.   At all times relevant to this Complaint, Plaintiffs and DHIP were ready, willing and able to continue performance under the loan agreement.

125.   Fifth Third repeatedly represented that the RLOC was close to being issued, that closing documents were imminent, and then that the deal was "done," but then backed out of the

deal after the scheduled date of closing.  These actions by Fifth Third were in bad faith and in breach of the obligation to act in good faith.

126.   As a direct result of Fifth Third's bad-faith actions in stringing along Plaintiffs and then backing out of its commitment, Fifth Third breached the implied covenant of good faith and fair dealing.

127.   Fifth Third's breach of the covenant of good faith and fair dealing was the proximate cause of the forced dissolution of Plaintiffs' business, the loss of their membership interests in DHIP, harm to their professional reputations and loss of partner distributions.

128.   Plaintiffs were harmed in an amount to be determined at trial, but in no event less than $10 million.

**WHEREFORE**, Plaintiff respectfully demands judgment as follows:

a.   On the First Cause of Action, an award in an amount to be determined at trial, but in no event less than $10 million plus interest and consequential damages;

b.   On the Second Cause of Action, an award in an amount to be determined at trial, plus interest, consequential and punitive damages;

c.   On the Third Cause of Action, an award in an amount to be determined at trial, but in no event less than $10 million plus interest and consequential damages;

d.   On the Fourth Cause of Action, an award in an amount to be determined at trial, but in no event less than $10 million plus interest and consequential damages;

e.   on all causes of action, special and punitive damages;

f.   awarding Plaintiffs such other and further relief as the Court may deem necessary, just or appropriate.

Dated: New York, New York
       December 23, 2013

HOGUET NEWMAN REGAL & KENNEY, LLP

By: _____

     Joshua D. Rievman (JR-0539)
     Sarah K. Logue (SL-0907)

10 East 40th Street
New York, New York 10016
Telephone: (212) 689-8808
Facsimile: (212) 689-5101

*Attorneys for Plaintiffs*